UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-11548-GAO

DEBORAH MURPHY,
Plaintiff,

v.

CAROLYN COLVIN,
Defendant.

OPINION AND ORDER
September 27, 2016

O'TOOLE, D.J.

The plaintiff, Deborah Murphy, appeals the denial of her application for Social Security Disability Insurance and Supplemental Security Income benefits by the Commissioner of the Social Security Administration. Before the Court are Murphy's Motion for Order Reversing the Commissioner's Decision (dkt. no. 15) and the Commissioner's Motion for Order Affirming the Decision of the Commissioner (dkt. no. 20). The court now affirms the Commissioner's decision because there is substantial evidence in the administrative record to support the decision, and no error of law was made.

I.      **Procedural History**

Murphy protectively applied for benefits on February 18, 2010 claiming that she had been unable to work since November 1, 2008. (Administrative Tr. at 198–208 [hereinafter R.].)[1] Murphy's applications were initially denied on July 23, 2010 and again upon reconsideration on

---

[1] The administrative record has been filed electronically (dkt. no. 13). In its original paper form, the administrative record's pages are numbered in the lower right-hand corner of each page. Citations to the record are to the pages as originally numbered rather than to the numbering supplied by the electronic docket.

December 30, 2010. (R. at 112–15, 137–51.) On February 23, 2011, Murphy filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (Id. at 154–55.)

On December 14, 2011, a video hearing was held before ALJ John S. Lamb. (Id. at 85–111.) At the video hearing, Murphy provided oral testimony and was represented by attorney Russell R. Bowling. (Id.) In addition to Murphy, ALJ Lamb heard oral testimony from vocational expert Mark Leaptrot. (Id. at 106–11.) On February 3, 2012, ALJ Lamb issued a written decision finding that although Murphy was unable to perform any of her past relevant work as an "administrative clerk and customer service worker," she could perform other work that exists in significant numbers in the national economy based on her "age, education, work experience, and residual functional capacity" ("RFC"). (Id. at 125–26.) Accordingly, ALJ Lamb found that Murphy was not disabled pursuant to the Social Security Act and therefore was not entitled to benefits. (Id. at 127.)

On March 21, 2012, Murphy requested a review of ALJ Lamb's decision by the Appeals Council. (Id. at 157.) Upon review, the Appeals Council vacated ALJ Lamb's decision and remanded the case for further consideration of Murphy's RFC, her mental impairments, and the medical opinions of record. (Id. at 132–36.) As a result, on June 3, 2013, a second hearing occurred before ALJ M. Dwight Evans. (Id. at 43–84.) At the hearing, Murphy again gave oral testimony and was again represented by Bowling. (Id. at 43–74.) ALJ Evans also heard testimony from vocational expert Theresa Manning. (Id. at 74–81.) On July 12, 2013, ALJ Evans issued a written decision finding that Murphy was not disabled because she was "capable of performing past relevant work as a secretary." (Id. at 37–38.) In response, on September 10, 2013, Murphy requested an Appeals Council review of ALJ Evans's decision (Id. at 19–20.) On February 5, 2013, the Appeals Council denied Murphy's request for review rendering ALJ Evans's decision the final

decision of the Commissioner. (Id. at 1–6.) Having therefore exhausted her administrative remedies, Murphy timely filed this civil action.

## II.   Background

Murphy was born on July 29, 1962, and has a high school education. (Id. at 47–48, 90.) Murphy alleges that she was diagnosed with Raynaud's disease at the age of twenty-nine, and that the onset date of her disability was November 1, 2008. (Id. at 100, 90.) Raynaud's is a circulatory disease that results in the narrowing of the "smaller arteries that supply blood to your skin" causing affected areas, such as the fingers and toes, to become "numb and cold." Mayo Clinic, Diseases and Conditions: Raynaud's Disease, http://www.mayoclinic.org/diseases-conditions/raynauds-disease/basics/definition/con-20022916 (last visited May 12, 2016). Prior to the alleged onset date Murphy worked as a secretary, but allegedly found it increasingly difficult to be effective as her Raynaud's purportedly worsened over time. (Id. at 52–53.) Murphy claims that her Raynaud's limits her ability to work. (Id. at 53–58.)[2]

### A.   Medical History

#### i.   Dr. Ashok K. Joshi

On February 2, 2010, Murphy began seeing Dr. Ashok K. Joshi, M.D. as her primary care physician. (Id. at 353.) The purpose of Murphy's first visit was to obtain a referral from Dr. Joshi to a vascular surgeon for possible treatment of her reportedly severe Raynaud's. (Id.) Dr. Joshi described Murphy as presenting with joint pain in multiple joints, joint stiffness, swelling in the small joints of her hand, and discoloration in her fingers. (Id.) Dr. Joshi reported that Murphy

---

[2] During the administrative proceedings, Murphy argued that she suffered from several limiting mental impairments in addition to her Raynaud's. ALJ Evans held that her mental impairments were non-severe, and Murphy has not challenged his decision in this action. (R. at 53–54, 94–95, 31.)

denied suffering from gout, rheumatoid arthritis (though he indicated an interest in follow-up), fatigue, rash, malar rash, or that she was taking any medications. (Id.) Dr. Joshi's examination of Murphy's rheumatology revealed a normal range of motion in her cervical spine, normal forward and lateral bending in her lumbar spine, normal range of motion of all joints in her upper extremity, normal range of motion of all joints in her lower extremity, and "puffy/swollen" hands with normal proximal interphalangeal joints. (Id. at 354.) Dr. Joshi noted that Murphy described smoking half a pack of cigarettes per day for the past twenty years, drinking alcohol on social occasions, and drinking one to two cups of coffee per day. (Id.)

On April 1, 2010, Murphy visited Dr. Joshi again for an annual physical exam. (Id. at 356.) During the visit, Dr. Joshi performed a routine medical exam and evaluated Murphy's Raynaud's and nicotine addiction. (Id.) Dr. Joshi described Murphy as having no appreciable disease, alert, and oriented. (Id. at 357.) Dr. Joshi reported that Murphy's skin was "unremarkable" with "no suspicious lesions," but that her hands and feet had a "bluish discoloration" caused by her Raynaud's. (Id. at 357–58.) To treat Murphy's Raynaud's, Dr. Joshi stated that she should continue to take cilostazol tablets two times per day, and ordered a battery of lab tests. (Id. at 356.) In addition, to combat her Raynaud's, Dr. Joshi recommended that Murphy stop smoking cigarettes and "wear gloves in cold weather." (Id.)

On October 19, 2010, Murphy visited Dr. Joshi for a follow up to review her test results. (Id. at 362.) Dr. Joshi reported that Murphy's chief complaint was a year of "constant pain" that she rated a "10/10" in her elbows and knees for which she was taking ibuprofen. (Id.) Dr. Joshi reported that Murphy described the pain in her elbow as bilateral, lateral, and exacerbated by lifting and holding things. (Id.) Murphy denied any radiation of the pain, redness, swelling, tingling, or numbness, or that it was caused by trauma or injury. (Id.) Dr. Joshi examined her elbow and found

4

there was no swelling, redness, or deformities, but that there was moderate tenderness on the lateral epicondyle. (Id.) Dr. Joshi opined that Murphy's range of motion was unremarkable with "normal flexion and extension," and strength was within normal limits. (Id.) Dr. Joshi performed a neurovascular examination and determined that Murphy had normal sensation and pulses. Based on the tests and Dr. Joshi's examination, he indicated that Murphy had tennis elbow, abnormal liver function tests ("LFT"), macrocytosis, alcoholic fatty liver, and proteinuria. (Id.) To treat the tennis elbow, Dr. Joshi referred Murphy to two rehabilitation facilities for physical therapy, and recommended that she begin a home exercise program. (Id. at 362–63.) For Murphy's abnormal LFTs and macrocytosis, Dr. Joshi ordered additional tests. (Id. at 363.) In light of her Raynaud's, Dr. Joshi referred Murphy to Dr. Joseph Rossacci, a specialist in nephrology, for her proteinuria. (Id.)

### ii.    Dr. Paul M. Burke, Jr.

On April 1, 2010, Murphy was examined by Dr. Paul M. Burke, Jr., M.D. Dr. Burke described Murphy's "long-standing history of Raynaud's," her attempts to treat the condition, and the challenges it has caused in her life, particularly in her ability to work. (Id. at 350.) Dr. Burke conducted a physical examination of Murphy describing her as "resting comfortably," but with diminished temperature in both hands with no discoloration, thickened skin potentially related to "chronic skin nutritional changes," intact motor functioning, and slightly depressed sensory functioning. (Id.)

Based on his examination, Dr. Burke told Murphy that it was imperative that she quit smoking immediately, and that she take cold avoidance measures such as moving to a warmer climate. (Id.) Dr. Burke opined that Murphy was suffering from "one of the worst cases of Raynaud's I have ever witness[ed]" and that she suffered from "classic symptoms." (Id.) Dr. Burke

prescribed Pletal "to see if that will improve her distal perfusion," and advised Murphy that he would see her again as needed. (Id.) As far as appears from the record, Dr. Burke had no further encounter with Murphy.

### iii.    Dr. Mary Connelly

On July 22, 2010, Dr. Mary Connelly, M.D. completed a Physical Residual Functional Capacity Assessment ("RFCA") based on a review of the medical records generated from Murphy's visits with Drs. Joshi and Burke. (Id. at 384.) In her RFCA, Dr. Connelly reported that Murphy could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for "about 6 hours in an 8-hour workday," sit for "about 6 hours in an 8-hour workday," and push and/or pull unlimitedly. Additionally, Dr. Connelly opined that Murphy had no postural, visual, or communicative limitations, that she had an unlimited ability to reach in all directions, finger, and feel, but that she had a limited ability to handle and was "limited to occ[assional] twisting and grasping." (Id. at 384–87.) In terms of environmental limitations, Dr. Connelly asserted that Murphy should "avoid all exposure" to extreme cold, but that she had an unlimited capacity for exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards such as heights and machinery. (Id. at 387.) To contend with Murphy's environmental limitations, Dr. Connelly recommended that Murphy "wear gloves when exposed to cold" and that she cease smoking. (Id.)

### iv.    Dr. Dorothy Linster

On December 20, 2010, Dr. Dorothy Linster, M.D. issued a Physical RFCA based on her evaluation of Murphy's medical records from Drs. Joshi and Burke. (Id. at 398.) With regard to exertional limitations, Dr. Linster averred that Murphy could occasionally lift and/or carry fifty pounds, frequently lift twenty-five pounds, stand and/or walk "about 6 hours in an 8-hour

workday," sit for "about 6 hours in an 8-hour workday," and push and/or pull unlimitedly. (Id. at 392.) Dr. Linster stated that Murphy had no postural, visual, or communicative limitations. (Id. at 393–95.) As to manipulative limitations, Dr. Linster asserted that Murphy had an unlimited capacity for reaching in all directions, fingering, and feeling, but that she was limited to frequent, but not continuous, handling because of her "hand pain/Raynaud's." (Id. at 394.) Finally, in regards to environmental limitations Dr. Linster opined that Murphy should "avoid even moderate exposure" to extreme cold, but that she could be exposed to an unlimited amount of extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (Id. at 395.)

v.     Dr. Isabella Pasniciuc

On July 29, 2010, Murphy was examined by Dr. Isabella Pasniciuc, M.D. for bilateral elbow pain. (Id. at 418.) According to Dr. Pasniciuc, Murphy had been experiencing progressive elbow pain for six months "to the point that she could not carry anything with her arms." (Id.) Murphy described the pain to Dr. Pasniciuc as radiating up to her shoulder, worse in the morning and in her right elbow, and aggravated by bending. (Id.) Murphy also discussed experiencing "diffuse numbness and tingling in her forearms and hands," regular coldness in her fingers, and pain in her lower back. (Id.) Murphy told Dr. Pasniciuc that the pain had escalated to such an intolerable level during the prior week that she went to the emergency room to seek relief. (Id.) During her emergency room visit, Murphy was prescribed Motrin, which Murphy stated was ineffective. (Id.) Dr. Pasniciuc noted that Murphy had a "scattered macular rash" on her chest, neck, abdomen, and lower legs that had "been there for a while" and had gone largely ignored. (Id.) Dr. Pasniciuc reported that previous testing had so far ruled out the possibility that Murphy was suffering from rheumatoid arthritis, systemic lupus erythematosus, or scleroderma. (Id.)

Dr. Pasniciuc's examination of Murphy's extremities revealed that Murphy's range of motion was "severely limited by pain" particularly on the right side and when bending, that she was experiencing tenderness in both elbows, that there were "hardened and thickened [illegible] on fingers on both hands," and that she had a papular rash on her palms. (Id. at 419.) Dr. Pasniciuc indicated that Murphy was "in mild distress due to pain," but that she was "alert and oriented x3" with "good judgment and insight" during the examination. (Id.) Based on her examination, Dr. Pasniciuc stated that Murphy had bilateral elbow pain, and provided her with a prescription for Voltaren Gel and 50 mg of Tramadol. (Id.) Dr. Pasniciuc advised Murphy to avoid cold weather and to obtain an x-ray of both elbows. (Id.) Dr. Pasniciuc also informed Murphy that she might be suffering from a "systemic connective tissue disease," and that "she might need to see a rheumatologist." (Id.)

One week later, on August 5, 2010, Murphy visited Dr. Pasniciuc again to follow up on her "persistent bilateral elbow pain." (Id. at 416.) Dr. Pasniciuc reported that the "x-rays of the elbow were negative." (Id.) According to Dr. Pasniciuc, Murphy reported that the "Voltaren gel helps a little bit," but that her fingers continued to turn cold and purple in cold climates. (Id.) During the examination, Dr. Pasniciuc noted that Murphy's condition appeared to have improved since her previous visit, but that she had "bilateral swollen hands," rashes on her palms, papules on her palms and neck, and purple discoloration on the tips of several of her fingers. (Id.) Dr. Pasniciuc indicated that she believed Murphy's elbow pain was related to her Raynaud's, that she should see a rheumatologist, and that if the pain continued she would "need to come back to have a local steroid injection." (Id.) Dr. Pasniciuc repeated her advice to Murphy that she avoid cold weather, and provided her with a prescription for Nifedipine. (Id.)

       *vi.*    *Dr. Stephen Burgess*

On September 14, 2011, Dr. Stephen Burgess, M.D., Ph.D. conducted a physical medical consultative examination of Murphy at Tri-State Occupational Medicine, Inc. (Id. at 401.) Dr. Burgess described Murphy as "a reliable historian" during his examination, and reported that they had discussed Murphy's history of Raynaud's and the personal and professional difficulties it has caused in her life. (Id.) Dr. Burgess opined that Murphy "has no specific limitations if she is warm." (Id.) Dr. Burgess further averred that when warm, Murphy is "able to stand, sit, walk, climb stair[s] or ladders, squat, kneel, bend, twist, carry, lift, and push or pull without limitations." (Id.) In addition, Dr. Burgess found that when warm, Murphy could "perform housework such as sweeping, mopping, doing laundry, vacuuming, washing dishes, cooking, dusting, making beds, mow[ing], and weed[ing]." (Id. at 401–02.) However, Dr. Burgess noted that when exposed to cold, Murphy's "hands become numb and stiff very quickly and she is unable to use her hands until she warms up" which prevents her from performing rudimentary tasks such as the lifting of "light items such as a cup." (Id. at 402.) Dr. Burgess noted that when Murphy's hands are cold she cannot "perform any sort of fine motor activity . . . this includes typing, writing, buttoning buttons, and so forth." (Id.)

Generally, Dr. Burgess described Murphy as "well developed and well nourished." (Id.) Dr. Burgess reported that Murphy was attempting to quit but was still smoking "two or three cigarettes a day," drinking one glass of alcohol per day, and was not taking any street drugs. (Id.) Dr. Burgess indicated that Murphy "ambulates with a normal gait, which is not unsteady, lurching, or unpredictable," and does not need the assistance of a handheld device. (Id.) Dr. Burgess opined that Murphy "has a normal stance and appears stable at station and comfortable in the supine and sitting positions." (Id.) According to Dr. Burgess, Murphy's intellectual functioning and hearing

appeared normal. (Id.) Dr. Burgess noted that Murphy was cooperative and that her memory for recent and remote medical events was good. (Id.)

Dr. Burgess examined Murphy's upper extremities and noted that her shoulders, elbows, and wrists were non-tender with no "redness, warmth, swelling or nodules." (Id. at 403.) Dr. Burgess indicated that Murphy was capable of forward flexion of her extended arms to 180 degrees bilaterally, "abduction of both extended arms in a sideways arc in the coronal plane of the body . . . to 180 degrees bilaterally," flexion of her elbows "to 150 degrees bilaterally with extension normal to 0 degrees bilaterally," and extension of her wrists "to 70 degrees bilaterally with flexion to 80 degrees bilaterally." (Id.) Dr. Burgess noted that his examination of her hands revealed "some redness, swelling, and tenderness . . . fairly globally." (Id.) Additionally, Dr. Burgess opined that Murphy's hands had no atrophy, Heberden or Bouchard's nodes, ulnar deviation or synovial thickening, and she could "make a fist bilaterally," could "write and pickup coins with either hand without difficulty," and had normal "range of motion of the joints of the fingers of both hands." (Id.) Dr. Burgess examined Murphy's lower extremities noting that there was "no tenderness, redness, warmth, swelling, fluid, crepitus or laxity of the knees, ankles, or feet," and "no calf tenderness, redness, warmth, cord sign, or Homans sign." (Id.) Dr. Burgess stated that Murphy was capable of knee extension to zero degrees and flexion to 150 degrees bilaterally. (Id.) Dr. Burgess opined that Murphy's "ankle joints demonstrate plantar flexion of 40 degrees bilaterally and dorsiflexion of 20 degrees bilaterally." (Id.) Dr. Burgess's examination of Murphy's skin revealed "significant splotchiness of the palms bilaterally with tiny macules which appear to be no larger than one to two millimeters in diameter, some of which are blanching and some of which are not," but otherwise her skin was "grossly unremarkable with no ulceration on the skin or fingertips." (Id. at 404.)

Dr. Burgess stated that Murphy had "severe Raynaud's phenomenon which affects her ability to work in any sort of cold or cool environment." (Id.) In addition, Dr. Burgess stated that he found "some indication on the hand of possible autoimmune disease or even vasculitis." (Id.) Dr. Burgess noted that Murphy would benefit from a follow-up with a rheumatologist, but that it was "probably not necessary" for the purposes of his evaluation. (Id.) In sum, Dr. Burgess opined that Murphy appeared "to be episodically moderately impaired" in her capacity "to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying, traveling, pushing and pulling heavy objects, as well as the ability to hear or speak" because of her observed medical issues. (Id.) Dr. Burgess concluded that Murphy's "insight into and description of [her] limitations" was consistent with his objective evaluation. (Id. at 405.)

In conjunction with his physical examination of Murphy, Dr. Burgess submitted a Medical Source Statement of Ability to Do Work-Related Activities (Physical) ("MSS"). (Id. at 406–11.) In his MSS, Dr. Burgess reported that Murphy could lift and carry up to twenty pounds continuously, fifty pounds frequently, and 100 pounds occasionally; sit for four hours, stand for two hours, and walk for one hour without interruption; sit for eight hours, stand for eight hours, and walk for eight hours in an eight-hour workday without the use of a cane; reach overhead frequently, and reach in all other directions, handle, finger, feel, push and pull with her hands continuously; operate foot controls continuously; climb stairs, ramps, ladders, and scaffolds continuously; balance, stoop, kneel, crouch, and crawl continuously; be exposed to unprotected heights, moving mechanical parts, humidity, wetness, dusts, odors, fumes, pulmonary irritants, and extreme heat continuously; operate a motor vehicle continuously; be exposed to vibrations occasionally and be exposed to very loud noises, but that she must never be exposed to extreme cold. (Id. at 406–10.) Dr. Burgess explained that his assessment of Murphy's limitations was

predicated on her "well documented Raynaud's Disease, which <u>absolutely precludes</u> working in extremely cold environments." (<u>Id.</u> at 410 (emphasis in original).) Dr. Burgess elaborated further that "working in temperatures below 70° can have [a] deleterious effect" based on Murphy's history, medical records, and Dr. Burgess's physical evaluation. (<u>Id.</u>) Dr. Burgess stated that, based on Murphy's physical impairments, she could "perform activities like shopping," travel unaccompanied, ambulate without an assistive device, "walk a block at a reasonable pace on rough or uneven surfaces," use public transportation, "climb a few steps at a reasonable pace with the use of a single hand rail," cook a "simple meal and feed herself," care for her personal hygiene, and "sort, handle, or use" papers and files. (<u>Id.</u> at 411.)

vii.    *Dr. Kenneth P. Reeder*

On October 18, 2011, Dr. Kenneth P. Reeder, Ph.D. conducted a comprehensive clinical psychological evaluation of Murphy for the North Carolina Department of Health and Human Services. (<u>Id.</u> at 412–14.) Dr. Reeder described Murphy as "alert and fully oriented to person, place, time, and situation." (<u>Id.</u> at 414.) According to Dr. Reeder, Murphy "denied having difficulty performing her activities of daily living" which consisted of watching the news, cooking, cleaning, doing laundry, shopping, and going to the library, but that it was taking her increasingly more time to perform them. (<u>Id.</u> at 413.)

Dr. Reeder opined that Murphy's memory of "recent and remote events was good," but that she had "some concentration difficulties" which were ameliorated when she slowed down and focused. (<u>Id.</u> at 414.) Dr. Reeder estimated that, based on Murphy's education and previous vocation, her intellectual functioning was "in or around the average range." (<u>Id.</u>) Dr. Reeder stated that Murphy displayed no "evidence of hallucinations or delusions," and "performed relatively well on a judgment task, but displayed significant difficulty interpreting abstract

sayings/proverbs." (Id.) Dr. Reeder diagnosed Murphy with Major Depressive Disorder and Alcohol Dependence in remission. (Id.) Based on this diagnosis, Dr. Reeder opined that it seemed "likely that she would be able to understand, retain, and follow instructions," and although it might take her more time to learn things, her "mental status results suggest that she should be able to learn information over time." (Id.) Dr. Reeder indicated that Murphy might be capable of performing repetitive tasks, but the "pain from her Raynaud's disease and her difficulty manipulating objects might interfere with" her performance. (Id.) In addition, Dr. Reeder stated that Murphy was capable of tolerating work-related stress based on her demonstrated capacity for mitigating stress in the past, and that she is capable of acquiring needed knowledge over time through repetition even if she has "significant concentration problems that will likely decrease her efficiency." (Id.) In conclusion, Dr. Reeder asserted that Murphy "should be able to independently manage benefits that she might obtain." (Id.)

        *viii.*    *Dr. David B. Rawlings*

On May 8, 2013, Dr. David B. Rawlings, Ph.D. performed a general intellectual and clinical psychological evaluation of Murphy at the behest of the Office of Disability Determinations of the Florida Department of Health. (Id. at 426.) According to Dr. Rawlings, at the time of his examination, Murphy's "hands were cold to the touch" and were discolored to a "reddish blue." (Id. at 427) Dr. Rawlings reported that Murphy complained of bladder incontinence four to five times per week, intermittent tingling sensations and numbness in her hands and to a lesser degree in her feet, "lightheadedness with postural changes," and low blood pressure. (Id.)

Dr. Rawlings described Murphy as "ambulatory without assistance" with no observable gait deviations, no difficulty standing once seated, and no retropulsion when standing. (Id. at 429) Dr. Rawlings noted that Murphy was "casually dressed and appropriately groomed," looked her

age, wore reading glasses when reading up close, did not appear to require a hearing aid, and did not have any perceivable or reported hygiene problems. (Id.) Dr. Rawlings reported that he found it easy to establish a rapport with Murphy and that "her behavior suggested full cooperation." (Id.) Dr. Rawlings noted that Murphy's mood and affect were "functionally intact," and that she was not "guarded, defensive, paranoid, suspicious. . . . overtly depressed, or emotionally labile," but that "she seemed to be overtly anxious" at times. (Id. at 429–30.) According to Dr. Rawlings, Murphy's speech seemed "somewhat pressured and harried" and it was necessary to restrain her "from time to time as she was verbally disinhibited." (Id. at 430.) Dr. Rawlings did not observe any "obvious word finding difficulties or paraphasic errors" during their conversation. (Id.) Dr. Rawlings noted that Murphy's "[a]uditory comprehension was functionally intact" with no perceptible hearing problems. (Id.) Dr. Rawlings reported that Murphy did not complain of pain or exhibit "overt pain behaviors," and did not express "other indications of abnormal thought content." (Id.)

ix.     *Dr. A. Neil Johnson*

On May 10, 2013, Dr. A. Neil Johnson, M.D. performed a medical evaluation of Murphy based on a referral by the Office of Disability Determinations of the Florida Department of Health. (Id. at 436.) Dr. Johnson reported that Murphy's chief complaints were for Raynaud's and depression. (Id.) Dr. Johnson noted that Murphy reported "that she doesn't really like to be in temperature below 80." (Id.) According to Dr. Johnson, Murphy cannot lift items heavier than a gallon, use a hammer, use a screwdriver, peel potatoes, or "open a tight jar lid." (Id.) According to Dr. Johnson, Murphy described experiencing difficulty "with buttons or picking up a coin or doing snaps" and cannot perform the tasks at all "if her hands are cold." (Id.) Dr. Johnson noted that Murphy can use utensils to eat, walk a quarter of a mile even though her feet turn purple because

14

of her Raynaud's, and "sit or stand satisfactorily." (Id.) Dr. Johnson noted that in regards to Murphy's mental health she "had a history of significant depression," suffered from sexual abuse as a young child, underwent divorce twice, and "has been diagnosed with ADHD, depression and post-traumatic stress disorder." (Id.) Dr. Johnson reported that Murphy was on no medications at the time. (Id.)

Dr. Johnson opined that Murphy "was very loquacious," somewhat anxious, and had "to be directed" to elicit her history. (Id. at 437.) Dr. Murphy reported that Murphy "can hear conversational speech without limitation," has clear speech, can walk "normally without the use of an assistive device," and experiences "no difficulty tandem walking or squatting." (Id.) Dr. Johnson examined Murphy's skin, eyes, neck, chest, heart, and abdomen with no indication of any abnormalities. (Id.) Dr. Johnson reported that Murphy did not have clubbing or cyanosis in her extremities, the peripheral pulses were intact, there was no peripheral edema, and no varicose veins. (Id.) However, Dr. Johnson reported that all of Murphy's fingers and toes were "essentially purple" and cool to the touch. (Id.) Dr. Johnson indicated that he could feel her radial and foot pulses bilaterally, but that they were "somewhat decreased." (Id.) Dr. Johnson noted that Murphy had full range of motion in her "shoulders, elbows, wrists, fingers, knees, and ankles," no ulcerations, and "no sign of rheumatoid arthritis." (Id.) Dr. Johnson reported that Murphy experienced difficulty buttoning, picking up a coin, snapping her clothing, and writing. (Id.) Dr. Johnson's neurological examination resulted in his finding Murphy negative in regards to the Romberg's Test, with intact sensation, 5/5 motor strength, symmetrical reflexes, and no disorientation. (Id. at 439.)

Dr. Johnson concluded that Murphy suffered from "severe Raynaud's" that "distinctly interferes with hand function," decreases her strength, and decreases her dexterity. (Id.) Dr.

Johnson noted that Murphy's Raynaud's was not being treated at the time because she could not "afford any treatment," and that she had found past treatments ineffective. (<u>Id.</u>) Dr. Johnson opined that Murphy could not type and write for extended periods of time "as might be expected as a secretary." (<u>Id.</u>) Dr. Johnson also reiterated that Murphy had "dealt with significant depression, post-traumatic stress disorder, and ADHD" ever since she was sexually abused. (<u>Id.</u> at 440.)

Based on his physical examination of Murphy, Dr. Johnson composed a MSS report. (<u>Id.</u> at 441–46.) Dr. Johnson reported that Murphy could occasionally lift and carry up to ten pounds, but she could never lift or carry more than that. (<u>Id.</u> at 441.) Dr. Johnson indicated she could sit and stand for two hours at a time, walk for one hour at a time, and that in an eight hour workday she could sit for eight hours, stand for six hours, and walk for four hours. (<u>Id.</u> at 442.) Dr. Johnson noted she did not need a cane to walk. (<u>Id.</u>) According to Dr. Johnson, Murphy could continuously reach in all directions, and occasionally handle, finger, feel, push, and pull with both her right and left hand, and occasionally operate foot controls, climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, crouch, and crawl. (<u>Id.</u> at 443–44.) Dr. Johnson reported that Murphy's hearing and vision were not impaired. (<u>Id.</u> at 444.) In regards to environmental limitations, Dr. Johnson noted that Murphy could be exposed frequently to the operation of a motor vehicle and loud noise, occasionally to moving mechanical parts, dust, odors, fumes, pulmonary irritants, vibrations, and never to unprotected heights, humidity, wetness, and extreme cold. (<u>Id.</u> at 445.) Dr. Johnson opined that Murphy could not "perform activities like shopping," but that she was capable of traveling unaccompanied, ambulating without an assistive device, "walk[ing] a block at a reasonable pace on rough or uneven surfaces," using public transit, climbing "a few steps at a reasonable pace without the use of a single hand rail," preparing a meal, caring for her personal hygiene, and sorting and handling papers and files. (<u>Id.</u> at 446.)

B.  <u>Relevant Testimony</u>

   i.  *The First Hearing: December 14, 2011*

    *(1)  Murphy*

On December 14, 2011, Murphy testified for the first time in a video hearing before ALJ Lamb. (<u>Id.</u> at 90–106.) Murphy testified that since the age of twenty-nine she has suffered Raynaud's attacks during which her arteries spasm causing her hands and fingers to become cold, purple, numb, swollen, and stiff. (<u>Id.</u> at 104, 92.) Murphy further explained that her Raynaud's causes ulcerations on her fingers and prevents her brain from being properly oxygenated which interferes with her ability to concentrate. (<u>Id.</u> at 92–93, 102–03.) As a result, Murphy testified that she is unable to function in any type of cold atmosphere making it difficult to work in an office-setting because of the prevalence of air conditioning. (<u>Id.</u> at 102, 93.) For example, she stated that she was disciplined at her prior job because she had "to keep stepping outside" to warm up, and that her concentration is so impaired that she cannot effectively read or watch a movie without losing her focus. (<u>Id.</u> at 101.) Furthermore, Murphy described the ways in which Raynaud's complicates her ability to complete various activities of daily living such as zipping her pants, fastening buttons, tying her shoes, retrieving change from her purse, shopping in food stores, and completing household chores in a timely fashion. (<u>Id.</u> at 105, 93.)

  According to Murphy, her Raynaud's is "something that's never going to go away. There's no cause and there's no cure." (<u>Id.</u> at 93.) In addition, Murphy testified that her lack of insurance has prevented her from seeing a rheumatologist or consistently treating her Raynaud's, but that none of the various treatments she has pursued in the past, such as taking nitroglycerine, blood thinners, or moving to the warmer climate of the South have adequately alleviated her symptoms. (<u>Id.</u> at 92–94, 100–01.)

*(2)      Vocational Expert Leaptrot*

During the hearing, vocational expert Mark Leaptrot ("VE Leaptrot") provided testimony regarding Murphy's prior work history and her capacity for future employment. (Id. at 107–10.) VE Leaptrot testified that Murphy had previously worked as an administrative clerk and as a customer service clerk as defined by the Dictionary of Occupational Titles ("DOT"). (Id. at 107.) VE Leaptrot testified that a hypothetical individual with an RFC for medium work but who must avoid all exposure to extreme cold and is "limited to simple, routine, repetitive tasks with low stress" could not return to Murphy's past work activities because they were semiskilled positions. (Id.) However, VE Leaptrot stated that such an individual could participate in unskilled light or sedentary work such as that of a routing clerk, office mail clerk, telephone information clerk, surveillance system monitor, or carding machine operator. (Id. at 108.) Based on a hypothetical posed by Bowling, VE Leaptrot testified that an individual with the same age, education, and past relevant work history as Murphy who was limited to light work, occasional use of her hands and fingers, and occasional concentration would be precluded from all work. (Id. at 109–10.)

*ii.      The Second Hearing: June 3, 2013*

*(1)      Murphy*

On remand, Murphy testified before ALJ Evans. Similar to her testimony before ALJ Lamb, Murphy described her history of Raynaud's, the limitations it imposed on her professionally and personally, her history of mental impairments, and her history of treatments. (Id. at 52–74.) According to Murphy, she was diagnosed with Raynaud's at the age of twenty-nine at which time her doctor advised her to leave her "job because of medical reasons" and she moved to Florida. (Id. at 53, 72.) Murphy stated that except for one day of work at a Costco, she had not worked since November 2008. (Id. at 52.) Murphy testified that prior to November 2008 she worked as a

secretary. (Id. at 52, 60–62.) According to Murphy, she struggled in this position because her Raynaud's caused her hands to turn purple and go numb if exposed to cold or stress which made it difficult for her to type, concentrate, write by hand, and manage files. (Id. at 52, 56.) Murphy further stated that she was often reprimanded for repeatedly going outside to warm up. (Id. at 52, 56, 60.) Murphy testified that after approximately one year of employment, she was discharged from her position at the same time a few of her coworkers were laid-off prior to the business's closure. (Id. at 60–62.) Murphy testified that after her discharge she received unemployment benefits for a period of time, but since then has depended on $200 worth of food assistance and her ability to live with a friend. (Id. at 59, 55, 58.) In addition, Murphy testified that she visited a vocational rehabilitation center three or four times and sought work online to no avail. (Id. at 63–64.)

In regards to her activities of daily living, Murphy testified that she spends most of her time reading, watching movies, taking occasional walks, and tending to household chores. (Id. at 68–71.) Murphy averred that she could cook, sweep, do laundry, and clean the dishes, but that these tasks take her an inordinately long time to accomplish. (Id. at 58, 69–70.) Murphy stated that she does not vacuum, iron, garden, provide childcare, participate in volunteer work, or affiliate with any community organizations. (Id. at 70–71.) Murphy further stated that her impairments interfere with her ability to get dressed, go shopping, open lids, and complete tasks in a timely fashion. (Id. at 57–58.) Murphy testified that she can drive and has not been in a car accident in over a decade. (Id. at 65, 59.)

Murphy testified that she did not have medical insurance and as a result was not receiving any form of medical treatment for her Raynaud's or her alleged mental impairments. (Id. at 54, 66–67, 73–74.) Murphy stated that when she was living in North Carolina she was sponsored by

Pfizer which allowed her to take Procardia to treat her Raynaud's, but that she had not found it particularly effective and had ceased taking it when she moved back to Florida. (Id. at 66.)

(2)   <em>Vocational Expert Manning</em>

After Murphy, vocational expert Theresa Manning ("VE Manning") provided ALJ Evans with testimony regarding Murphy's prior and potential work activities. (Id. at 74–81.) VE Manning testified that Murphy's prior work was the sedentary and skilled work of a secretary as defined by the DOT. (Id. at 74–75.) Based on three hypotheticals posed by ALJ Evans, VE Manning testified that an individual of Murphy's same age, education, and work experience with a RFC equal to those described in the MSS of Dr. Burgess and the RFCAs of Drs. Linster and Connelly could perform Murphy's prior work as a secretary. (Id. at 75–78.) However, VE Manning testified that a similarly situated individual with a RFC as described by Dr. Johnson's MSS could not perform Murphy's prior work or any other job that exists "in significant numbers in the local, regional, or national economy." (Id. at 78–79.) Finally, based on a hypothetical posed by Murphy's attorney Bowling, VE Manning testified that a similarly situated individual who could not "concentrate and sustain attention for up to two hour periods. . . . due to severe levels of depression and moderate anxiety," who was limited to occasional lifting and carrying of up to ten pounds, occasional handling, fingering, feeling, pushing, pulling, climbing of stairs, ramps, ladders, and scaffolds, balancing, stooping, kneeling, crouching, and crawling, who could never be exposed to unprotected heights, humidity, wetness, and extreme cold would be precluded from all work. (Id. at 80–81.)

## III.   Disability Determination Process

The Social Security Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

20

be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is considered disabled if her:

> Physical or mental impairment or impairments are of such severity that [she] is not
> only unable to do [her] previous work but cannot, considering [her] age, education,
> and work experience, engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such works exists in the
> immediate area in which [she] lives, or whether a specific job vacancy exists for
> [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A).

To determine whether an individual qualifies as disabled, the Social Security

Administration has promulgated a five-step sequential evaluation process. 20 C.F.R. §§

404.1520(a), 416.920(a). Every claimant does not proceed through all five steps, as a

determination of disability can be reached at each. Id. During the process, the claimant bears "the

burden of production and proof at the first four steps." Freeman v. Barnhart, 274 F.3d 606, 608

(1st Cir. 2001). If the claimant successfully carries their burden, at the fifth step, the burden shifts

to the Commissioner to provide "evidence of specific jobs in the national economy" that the

claimant is capable of performing. Id.

ALJ Evans's decision after remand adhered to the five-step sequential evaluation process.

(R. at 28–29.) At step one, ALJ Evans averred that Murphy had "not engaged in substantial gainful

activity since November 1, 2008, the alleged onset date." (Id. at 29)

At step two, ALJ Evans determined that Murphy's Raynaud's constituted a severe

impairment that resulted in "limitations that significantly affect the claimant's ability to perform

basic work activities." (Id. at 29–30.)

At step three, ALJ Evans found that Murphy did "not have an impairment or combination

of impairments that meets or medically equals the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1." (Id. at 32.) ALJ Evans found that, based on Murphy's

medical record and hearing testimony, she did not have the requisite "degree of symptoms and the documentation and continuity of medical treatment" necessary to establish an impairment as severe as those listed. (Id.) As a result, ALJ Evans proceeded to evaluate Murphy's RFC in anticipation of step four. (Id.) The RFC represents the most the claimant can do in terms of the "physical, mental, sensory, and other requirements of work," despite the limitations imposed by her impairment and its resultant symptoms. 20 C.F.R. §§ 404.1545, 416.945. ALJ Evans determined that Murphy possessed the RFC "to perform the full range of medium work as defined" by 20 C.F.R. § 404.1567(c) and § 416.967(c), with the ability to do various work-related activities on a regular and continuing basis as described in Dr. Burgess's MSS. (R. at 32.) In support of this conclusion, ALJ Evans asserted that he considered all of the symptoms associated with Murphy's Raynaud's and found that Murphy's contentions in regards to the "intensity, persistence and limiting effects" of the symptoms were "not entirely credible" because of the activities of daily living Murphy described to Dr. Reeder, her "relatively infrequent trips to the doctor for the allegedly disabling symptoms," and Evans's his holistic review of the record. (Id. at 33–34.)

At step four, ALJ Evans found that based on his RFC evaluation, Murphy was "capable of performing past relevant work as a secretary, DOT #201.362-030, sedentary with an SVP of 6 (skilled)." (Id. at 37.) ALJ Evans explained that he based this decision on testimony from VE Manning that a hypothetical person with Murphy's RFC could perform the work of a secretary, and his own comparison of Murphy's RFC "with the physical and mental demands of the work." (Id.) Specifically, ALJ Evans found that based on Murphy's RFC, her exertional capabilities exceeded the demands of sedentary secretarial work, and "she does not have a mental impairment or other nonexertional limitations that preclude her from performing skilled work." (Id.) As a result, ALJ Evans determined that Murphy had not been disabled from her onset date of November

1, 2008 to the date of his decision on July 12, 2013. (Id.) Consequently, ALJ Evans did not proceed to step five, and Murphy's application for benefits was denied. (Id. at 37–38.)

## IV.    Standard of Review

Pursuant to 42 U.S.C. § 405(g), an individual may seek review of any final decision by the Commissioner within sixty days. 42 U.S.C. § 405(g) (2015). Upon review, a district court may affirm, modify, or reverse the decision based "upon the pleadings and transcript of the record." Id. However, the court's review is pointedly circumscribed. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). The court's review is limited to an evaluation as to whether the "ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Id. An ALJ's findings in regards to any facts are conclusive "if supported by substantial evidence." Id. Where there is substantial evidence to support the Commissioner's decision it must be affirmed "even if the record arguably could justify a different conclusion." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). Substantial evidence requires "more than a mere scintilla," and exists when there is sufficient relevant evidence that a "reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). When reviewing the record, the ALJ, not the court, is responsible for drawing factual inferences, making credibility determinations, and resolving evidentiary conflicts. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).

## V.    Discussion

On appeal, Murphy argues that ALJ Evans's determination should be overturned for lack of substantial evidence and legal error because ALJ Evans did not properly weigh the medical opinion evidence. (Pl.'s Br. in Supp. of a Social Security Appeal 12–13 (dkt. no. 16) [hereinafter

23

Pl.'s Br.].) Specifically, Murphy contends that ALJ Evans inadequately weighed the medical opinion evidence in two ways: (1) by giving "great weight" to Dr. Burgess's opinion but not "adequately address[ing] the limitations expressed in that opinion" in his RFC determination and colloquy with VE Manning, and (2) by not giving the opinions of Drs. Joshi and Burke controlling weight as treating physicians. (Id. at 13–17.)

A.      Opinion of Dr. Burgess

i.      RFC Determination

Murphy alleges that ALJ Evans committed legal error by attributing "great weight" to the opinion of Dr. Burgess, but not adopting all of the limitations articulated in Dr. Burgess's opinion in his RFC determination. (Id. at 13.) More specifically, Murphy maintains that ALJ Evans erred by not incorporating a limitation in his RFC which reflects Dr. Burgess's finding that "even working in temperatures below 70°F can have [a] deleterious effect" on Murphy. (Id. at 14 (citing R. at 410.))

It is the exclusive prerogative of the ALJ, as the designee of the Commissioner, to determine a claimant's RFC based on the ALJ's assessment of the entirety of the record. 20 C.F.R. §§ 404.1545, 416.945. While conducting his appraisal, the ALJ must consider each medical opinion in the record and determine what weight it will be given. 20 C.F.R. §§ 404.1527, 416.927, 404.1520b, 416.920b. Unless a treating source is given "controlling weight," the weight attributed to all other medical opinions is to be determined by the ALJ based on the application of the following factors: (1) whether the source examined and/or treated the claimant; (2) the length and frequency of the treatment relationship; (3) the "nature and extent of the treatment relationship;" (4) the strength and sufficiency of the evidence relied upon in the formation of the opinion; (5) the consistency of the opinion with the record as a whole; (6) the specialty, if any, of the source; and

(7) any other factors brought to the ALJ's attention by the claimant. 20 C.F.R. §§ 404.1527(c), 416.927(c). Finally, when issuing his RFC assessment the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996).

Murphy's argument is ultimately unpersuasive because she does not cite to, nor do I find, any First Circuit precedent indicating that once an ALJ has ascribed "great weight" to a medical opinion he is then bound to incorporate the totality of that doctor's opinion into their RFC determination. On the contrary, the First Circuit has expressly rejected the idea that "there must always be some super-evaluator," and instead has held that ALJs are permitted "to piece together the relevant medical facts from the findings and opinions of multiple physicians." Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 144 (1st Cir. 1987). Furthermore, unlike "controlling weight," the label "great weight" is not a legal term of art. In fact, the term is never mentioned in the regulations which set forth how the ALJ is to evaluate opinion evidence. See 20 C.F.R. §§ 404.1527, 416.927, 404.1520b, 416.920b.

ALJ Evans explained that he attributed "great weight" to Dr. Burgess's opinion because he found that the doctor:

> [P]resented relevant evidence to support his opinion, and he provided a good explanation for his opinion. (20 C.F.R. 404.1527(d)). Furthermore, his opinion is consistent with and supported by the medical evidence as a whole including claimant's own self-reported activities of daily living and claimant's relatively normal physical examinations that showed minimal limitations overall.

(R. at 36.)

While perhaps brief, ALJ's Evans's description of his rationale for affording "great weight" to the opinion of Dr. Burgess demonstrates that his determination was based on his overall evaluation of the record, and that he applied the required regulatory factors. See 20 C.F.R. §§

404.1527, 416.927. Accordingly, ALJ Evans has not committed legal error, and his determination cannot be disturbed if supported by substantial evidence.

In the absence of legal error, the operative question becomes whether it was reasonable for ALJ Evans's not to have incorporated Dr. Burgess's remark into his RFC determination. (Pl.'s Br. 14 (citing R. at 410.)) Revealingly, the notation at issue was offered as a response to the MSS form's prompting to "identify the particular medical or clinical findings . . . which support your assessment or any limitations and why the findings support the assessment." (R. at 410.) Given this context, and the permissive language of Dr. Burgess's notation ("*can* have [a] deleterious effect"), it is reasonable for ALJ Evans to have read the comment not as an additional limitation, but as an identification by Dr. Burgess of a finding that supports his assessment that Murphy could never be exposed to extreme cold. (See id.) As such, there was substantial evidence to support ALJ Evans's decision to include only the limitation that Murphy never be exposed to extreme cold. (Id. at 410, 32, 36.)

Furthermore, surveying the record as a whole, there was substantial evidence to support ALJ Evans's decision not to include Dr. Burgess's notation in his RFC assessment. No other medical opinion in the record included a precise proscription regarding exposure to temperatures below seventy degrees. While Drs. Joshi, Burke, Connelly, Linster, Pasniciuc, and Johnson all advised Murphy to avoid cold temperatures, only Dr. Burgess indicated that Murphy's threshold for exposure could be around seventy degrees. (Id. at 356, 350, 387, 395, 419, 445.) In fact, Dr. Johnson noted that Murphy "doesn't really like to be in temperatures below 80." (Id. at 436.) Given the lack of consistency, it is reasonable for ALJ Evans to have elected not to incorporate Dr. Burgess's seventy degree notation, and to have instead decided that a limitation that Murphy avoid all exposure to extreme cold accurately represented her RFC based on the record.

ii.      *Colloquy with VE Manning*

According to Murphy, ALJ Evans erred by not providing "VE Manning with an accurate depiction of [Murphy's] limitations" as expressed in Dr. Burgess's opinion, and that as a result VE Manning's testimony could not constitute substantial evidence. (Pl.'s Br. 14–15.) To qualify as substantial evidence, a vocational expert's opinion must be based on a hypothetical posed by the ALJ that accurately depicts the claimant's limitations. Cohen v. Astrue 851 F. Supp. 2d 277, 282 (D. Mass. 2012) (citing Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).

Murphy advances two arguments in support of her contention that ALJ Evans did not accurately portray Murphy's limitations during his colloquy with VE Manning. First, Murphy argues that ALJ Evans erred by not including the limitation that Murphy "has well documented Raynaud's Disease, which absolutely preclude working in extremely cold, environments, even working in temperatures below 70°F can have deleterious effect." (Pl.'s Br. 14 (citing R. at 410.)) At the outset, this argument ignores the fact that ALJ Evans explicitly included the limitation that Murphy could not be exposed to extreme cold in his hypothetical to VE Manning. (R. at 76.) Moreover, for the same reasons addressed above, ALJ Evans was not legally bound to incorporate every notation within Dr. Burgess's opinion, and acted within his authority when he appraised the record as a whole and chose not to include the seventy degree limitation in his RFC determination.

Second, Murphy contends that ALJ Evans committed error by not including "Dr. Burgess's restriction that Plaintiff would experience symptoms of Raynaud's Phenomenon in air conditioned, temperature controlled environments (such as an office setting)" in his RFC determination. This argument is unpersuasive for two reasons. First, it is not clear that Dr. Burgess ever proffered such a restriction. In his evaluation notes, Dr. Burgess opined that Murphy's Raynaud's "affects her

ability to work in any sort of cold or cool environment," but when Dr. Burgess set forth his opinion on Murphy's specific limitations in his MSS he included only a limitation that Murphy never be exposed to extreme cold. (Id. at 404, 410.) As a result, it was reasonable for ALJ Evans to decide that Dr. Burgess believed Murphy could work in an air conditioned environment or office setting so long as she was not exposed to *extreme* cold. Second, there is substantial evidence to support the RFC determination ALJ Evans posed to VE Manning. While ALJ Evans found that Murphy was indeed limited in regards to her capacity for exposure to extreme cold, he also explained that he found Murphy's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely credible." (Id. at 32, 34.) ALJ Evans explained that he based his credibility determination on the entirety of the medical opinion evidence, Murphy's self-reported activities of daily living, the infrequency of her medical treatment, her ability to work in an office environment prior to being discharged, and her certification that she was "ready, willing and able to work" when she applied for unemployment benefits. (Id. at 33–37.) Although ALJ Evans's determination might not be the only conclusion which could have been reached, the determination was nevertheless reasonable and soundly within his province as the trier of fact. See Rodriguez Pagan, 819 F.2d 1 at 3.

      B.      Opinions of Drs. Joshi and Burke

Murphy further avers that ALJ Evans erred by not properly weighing the opinions of Drs. Joshi and Burke in accordance with the so-called "Treating Physician Rule," and by relying on her activities of daily living as a reason not to ascribe them controlling weight. (Pl.'s Br. 15–17.) In general, an ALJ will give greater weight to a treating source opinion because they are likely able to provide "a detailed, longitudinal picture of" the claimant's medical impairment, and their opinions benefit from a unique perspective unshared by "objective medical findings alone or from

reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Accordingly, if the ALJ finds that a treating source's opinion regarding the "nature and severity" of the claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record it is to be given "controlling weight." Id. However, the ALJ remains at liberty to ascribe less than controlling weight to the opinion of a treating physician. C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). When attributing less than controlling weight to a treating source's opinion, the only constraint is that the ALJ must "give good reasons" for his decision based on consideration of: (1) the length, frequency, nature, and extent of the treatment relationship; (2) the supportability of the opinion; (3) the consistency of the opinion with the record as a whole; (4) the treating physician's specialization in the relevant area of medicine; and (5) other factors brought to the ALJ's attention. 20 C.F.R. §§ 402.1527(c)(2)–(6), 416.927(c)(2)–(6).

Initially, Murphy maintains that "Drs. Joshi and Burke were treating sources whose opinions, under the regulations were entitled to dispositive weight." (Pl.'s Br. 17.) Murphy's argument is unavailing for three reasons, namely, it incorrectly classifies Dr. Burke as a treating physician, exaggerates the amount of deference an ALJ is compelled to give the opinion of a treating source, and ignores the substantial evidence underpinning ALJ Evans's decision.

First, Murphy mischaracterizes Dr. Burke as a treating physician whose opinion is entitled to more weight. The opinion of a treating source will only be accorded greater weight when the source has seen the claimant "a number of times and long enough to have obtained a longitudinal picture" of the claimant's impairment. 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i). According to the record, Dr. Burke saw Murphy only once. (R. at 350.) As a result, Dr. Burke's consulting opinion lacked the unique depth and perspective which warrants the assignation of greater weight

to his opinion. Accordingly, ALJ Evans was not constrained by the "Treating Physician Rule" and properly determined what weight to attribute Dr. Burke's opinion based on his analysis of the record as a whole. See 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).

Second, Murphy's argument overstates the level of deference an ALJ must afford a treating source's opinion. The opinion of a treating physician is not "entitled to dispositive weight." It is up to the ALJ to decide whether a treating physician's opinion merits "controlling weight" based on whether or not it comports with accepted clinical evidence and the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Third, Murphy's argument overlooks the substantial evidence ALJ Evans described in support of his decision. In conformity with the regulations, ALJ Evans considered the opinions of Drs. Joshi and Burke in light of the record as a whole, and determined that they would be granted "limited weight" and partial "significant weight" respectively. (R. at 34.) ALJ Evans explained that he assigned the opinion of Dr. Joshi only limited weight because he found it to be "inconsistent with the majority of the medical record," and with Murphy's self-reported ability to engage in her activities of daily living. (Id.) In regards to the opinion of Dr. Burke, ALJ Evans stated that he ascribed "significant weight" to his diagnosis concerning "the severity of [Murphy's] longstanding impairment," but "little weight" to his opinion regarding Murphy's ability to work and his belief that Murphy "has one of the worst cases of Raynaud's he had ever witnessed." (Id.) ALJ Evans stated that he attributed "little weight" to this portion of Dr. Burke's opinion because he found it incongruent with other evidence in the record which demonstrates that she was "not significantly limited in her ability to attend to her activities of daily living, personal hygiene, and has worked with the condition since it was diagnosed when she [w]as in her 20's." (Id.) Consequentially, since

30

ALJ Evans's determination was supported by substantial evidence in the record it cannot be overturned.

Finally, Murphy argues that ALJ Evans's evaluation of the opinions of Drs. Joshi and Burke was inappropriate because ALJ Evans relied on Murphy's activities of daily living to infer that she had the ability to engage in full-time work. (Pl.'s Br. 17.). According to Murphy, all of her activities of daily living took place in her home where she "is plainly able to control the temperature." (Id.) However, ALJ Evans explained that his decision was based on Murphy's reported ability to engage in activities both inside and outside the home such as shopping and going to the library. (R. at 35, 413.) Although there is conflicting evidence as to whether or not Murphy could go shopping in stores where the temperature is often quite low, (Id. at 57, 105, 411, 413.), it is the ALJ's responsibility, not this Court's, to resolve evidentiary conflicts and to draw factual inferences, see Irlanda Ortiz, 955 F.2d 765, 769 (1st Cir. 1991). Since ALJ Evans set out specific findings, supported by the evidence in the case record, his determination must be upheld, even if the evidence could reasonably have justified a different conclusion.

## VI.    Conclusion

For the reasons stated herein, Murphy's Motion for Order Reversing the Commissioner's Decision (dkt. no. 15) is DENIED, and the Commissioner's Motion for Order Affirming the Decision of the Commissioner (dkt. no. 20) is GRANTED. The ALJ's decision is AFFIRMED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge